# EXHIBIT 11

Grunley-Walsh

5010 Nicholson Lane, Suite 200
Rockville, MD 20852

RECEIVED
FEB 20 2007
DSC
CONTRACTING SERVICES

February 16, 2007

United States Department of
The Interior – NPS
Denver Service Center
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287
**ATTN: John M. Fox, Contracting Officer**

**RE: Washington Monument Physical Security System**
**Contract No. 1443CX305998901; Task Order No. 35**

**Subj: Certified Claim/Request For Equitable Adjustment to Contract Amount**
**NPS MOD 10 Unilateral Deductions - $210,000**

**Request For Contracting Officer's Final Decision**

Dear Mr. Fox:

Reference is made to our contract for the above Project as well as to Task Order No. 35. Reference is also made to Modification No. 10, which you unilaterally issued on February 9, 2007, to arbitrarily deduct from our Contract / Task Order $210,000 for alleged issues for which the Park Service is making an improper and unfounded counter-claim against Grunley-Walsh.

It is disappointing that you, as the Contracting Officer, believe the NPS is not bound by the Disputes clause in our contract and/or the Contract Disputes Act. As I am sure you are aware, pursuant to the Disputes clause and the Contract Disputes Act, any claim by the Government against the Contractor must be the subject of a written final decision by the Contracting Officer. Despite this fact and despite the fact the documents included in Modification No. 10 (copy attached as **EXHIBIT 1**), confirm the Park Service's acknowledgement of the "disputes" concerning the items in Modification No. 10, the Modification was issued with out a Contracting Officer's Final Decision.

Given these circumstances, and in order to permit the Court jurisdiction to decide the disputes concerning the items in Modification No. 10, Grunley-Walsh is herewith submitting this matter and the unjustified deduction of $210,000 from Task Order No. 35 as a Certified Claim / Request For Equitable Adjustment ("REA") in accordance with the Contract Disputes Clause and the Contract Disputes Act. In doing so, we request a Contracting Officer's Final Decision on this matter within 60 days.

**Entitlement and Quantum Overview**

On May 6, 1998 Grunley-Walsh was awarded an Indefinite Quantity Contract to stabilize and preserve the Washington Monument (Contract No. C3059980901). Pursuant to Contract Modification No. 0007, dated November 15, 2001, the General Provisions to our original contract were deleted and replaced with revised contract clauses which included certain FAR provisions incorporated by reference. Two of these provisions included the Changes clause (FAR 52.243-04 August 1987) and the Disputes clause (FAR 52.233-01 December 1998).

In accordance with the Contract, on December 5, 2003 Grunley-Walsh was issued Task Order No. T3059989135 (Task Order No. 35) in the amount of $13,993,216. Among other things, Task Order No. 35 required Grunley-Walsh to construct and install an above-ground security barrier system in accordance with certain specifications and drawings prepared under a previous Task Order by the Olin Partnership.[1] This included the construction of elements contained on NPS Drawing No. 807-41032. These drawings included the 90% construction documentation that existed as of November 2003.

**1. Street Sidewalk Work – Deduct ($190,000)**

Modification No. 10 alleges Grunley-Walsh has provided the Park Service "non-conforming" sidewalks, "generally identified as the 26 cracked panels and the cracked 15th Street

[1] The Olin Partnership was Grunley-Walsh's design consultant for the work required in Task Order No. 35.

panels." To support this ridiculous allegation, the modification attaches an incomplete (2nd page missing) copy of a November 7, 2006 Park Service letter that states, "Two areas of sidewalk dispute are the 15th Street sidewalks and the 26 panels." The modification provides no other documentation indicating the location of the cracks in question, when the cracks were discovered, the cause of the cracks and/or the square footage a sidewalk concrete requiring correction.

### a. The 15th Street Sidewalk Work

During the course of the Project the NPS directed Grunley-Walsh to replace the sidewalk along 15th Street as a change to the contract. Grunley-Walsh's cost proposal to perform this change work totaled $43,509 and the change work itself was performed during the period between May 17, 2005 and June 1, 2005. (A copy of Grunley-Walsh's cost proposal for the 15th Street Sidewalk work in included in **EXHIBIT 2**). Task Order No. 35, Modification No. 8, Item A.14 provided compensation to perform this change work in the amount of $43, 509.[2] (A copy of Modification No. 8 along with Grunley-Walsh's January 19, 2006 letter of clarification is attached as **EXHIBIT 3**).




[2] Item A.14 of Contract Modification No. 8 was included in the global settlement of several add and credit items that resulted in a net add of $150,000. The computation notes for this $150,000 amount include $43,509 for the 15th Street sidewalk replacement work. These computation notes are included in **EXHBIT 3.**

An important background aspect of this change work is the fact that it was directed by the Park Service just prior to the July 4, 2005 re-opening celebration of the Washington Monument Grounds. As such, due to the need to have this work quickly performed, the Park Service did not require and/or issue any Task Order or directive to prepare a design for the sidewalk that would depict placement of joints, the type/placement of reinforcement steel, the use of any expansion material, the use of any caulking material and/or the interface of the new concrete work at existing foundations for telephone poles, light poles, traffic light poles, etc., which existed in the area of sidewalk to be replaced. Instead, the Park Service simply required Grunley-Walsh to provide several sample "mock-ups" which the Park Service reviewed and approved – particularly with respect to concrete color and aggregate.

In constructing the sidewalks Grunley-Walsh utilized 6 inches of concrete with a 4,000 psi rating and a 4" slump. The concrete was placed on a compacted gravel sub-base and on-top of a 6" wire mesh. The entire construction process was observed by the Park Service's on-site representatives, who raised no comment, objection or concern about the construction methods.




As the Park Service is aware, approximately 4 months after the July 4, 2005 re-opening celebration for the Monument, cracks began to develop in the sidewalk. The location of these

cracks was predominantly around existing structures in the sidewalks, such as light poles and telephone poles, which had their own existing concrete foundations. A standard felt expansion joint material was used between the new sidewalk concrete and the existing foundations.




When the cracks began to develop, no one could explain why they were developing. The sidewalks were reviewed by Grunely-Walsh's A/E, as well as two independent inspectors hired by the engineer and our subcontractor, Cherry Hill Construction. They too, could not explain the reasons for the cracks.

Despites these facts, the Park Service demanded replacement of the cracked sidewalks. In doing so, they didn't request a new design; nor did they provide Grunley-Walsh a new design (which is what the Park Service did in other locations where they wanted the sidewalks changed or replaced). In effect, without knowing what caused the sidewalk cracking, the Park Service wanted Grunley-Walsh to tear out the cracked sidewalks and replace them using the same construction methodology – regardless of whether they cracked again.

Given these circumstances, by letter dated August 24, 2006 (copy attached as **EXHIBIT 4**), Grunley-Walsh rejected the Park Service's demand to replace the cracked sidewalk panels. In response, by letter dated November 7, 2006 (copy attached to Mod 10 in **EXHBIT 1**) the Park Service attempted to impliedly attribute the cracking problems at the 15th Street sidewalks to other cracking issues on sidewalks which were part of the design development documents provided pursuant to Task Order No. 28.

For the 15th Street sidewalks, however, no design was ever provided/required. Further, the Park Service has provided no documentation or analysis to establish the construction of the 15th Street sidewalks was defective and/or the cracks were the result of faulty construction. Rather, Modification No. 10 simply alleges the work was non-conforming. It doesn't explain the bases (other than the existence of cracks) for the alleged "non-conformance." It can't, because there was no design by which to establish and/or measure non-conformance against.

**b. The Alleged 26 Cracked Panels**

It is no secret that cracks existed in certain sidewalk panels when the sidewalk work was substantially completed for the July 4, 2005 re-opening celebration. Some of the cracks were the result of vehicular traffic driving on the sidewalks.



Non Grunley-Walsh Vehicular Traffic Setting Up for the July 4, 2005 Re-Opening Celebration




Damage Done to Sidewalk by Non Grunley-Walsh Vehicular Traffic

Other cracks occurred which could not be explained. A large number of these cracks were identified, measured, and reviewed with both Grunley-Walsh personnel and Park Service personnel prior to the July 4, 2005 re-opening celebration. Thereafter, during a walkthrough in September 2005 additional cracks were identified, measured and reviewed with Grunley-Walsh personnel, the Park Service and the A/E team. At the time, it was decided to wait until the Spring of 2006 (after the winter of 2005 freeze/thaw cycles) to effect repairs. This is why the repair work began in May 2006.

During the repair work a few additional cracks were found. Again these too were identified, measured and reviewed with both Grunley-Walsh and the Park Service personnel. By August 18, 2006, the last of the identified cracked sidewalks had been repaired and replaced.




Sidewalk Crack Being Identified, Measured and Reviewed

Fourteen months after the July 4, 2005 re-opening celebration and after Grunley-Walsh had completed all of the sidewalk repair/replacement work, in September 2006 the Park Service allegedly identified 26 new cracks in sidewalks where they wanted the sidewalk panels replaced. This time, however, the cracks were not identified, measured and reviewed by both Grunley-Walsh and the Park Service. Rather, a Park Service employee apparently pointed to out to Cherry Hill Construction's foreman the 26 cracks. To date, nothing has ever been provided to Grunley-Walsh identifying the location or even the existence of the 26 cracks (including the Park Service's letter of November 7, 2006).

What is obvious, however, is the fact that these alleged 26 cracks were not observed during the inspections prior to the July 4, 2005 re-opening celebration; they were not observed in September 2005; nor were observed when the repair/replacement work was being performed and completed. No, they were not observed until well over a year after the re-opening celebration and after numerous events on the Monument mall where the sidewalks were used by various vehicular traffic of the Park Service and other Government agencies.

For these reasons, by letter dated November 10, 2006 (copy attached as **EXHIBIT 6**), Grunley Walsh informed the Park Service no additional sidewalks would be repaired or replaced. Maintenance of the Monument and its surrounding sidewalks was never a Grunley-Walsh contract responsibility.

**2. <u>Irrigation System Change Work – Deduct ($20,000)</u>**

Modification No. 10 also unilaterally deducts, without justification or explanation, $20,000 from Task Order No. 35 for alleged non-conforming irrigation work. How this amount is arrived at is not explained. Again, perhaps your Final Decision will provide your computation.

Further, to support its position on this issue, the Government attaches to Modification No. 10 its self serving December 4, 2006 letter. Conspicuously omitted from Modification No. 10, however, is Grunley-Walsh's December 15, 2006 letter (copy attached as **EXHIBIT 5**), which fully responded to the December 4th letter. As explained in Grunley-Walsh's response, when the Park Service's letter of December 4th was received, the NPS had winterized the irrigation system – rendering it inoperable. Grunley-Walsh's response also attached letters from the irrigation design consultant, Lynch & Associates, as well as the irrigation subcontractor, Davey Tree (copies included in **EXHIBIT 5**). As indicated in the Lynch & Associates letter as well as our letter, to the extent any corrections to the system were needed, they would have to wait until the spring start-up.

Similarly, as indicated in the Davey Tree letter, there were many items on the Park Service's irrigation system punch list that are not tied to any specification or contract requirement. There were also many items that were the result of damage to the irrigation system after major events on the Monument mall. You Mr. Fox and the Park Service are fully aware that numerous irrigation valve boxes have been damaged by fire trucks and park service vehicles driving across the grass. Even though the irrigation system has been in operational use by the Park Service for nearly 2 years, apparently the Park Service believes we are their irrigation "maintenance contractor" as well as their installation contractor.

### 3. The Absurdity of the Park Service's $210,000 Claim

Given the fact the Park Service has refused to pay the $742,000 price tag to perform the change work associated with the installation of the irrigation system in the first place, it is absolutely incredulous the Park Service would assert entitlement to a $20,000 deduct for alleged non-conforming work. Mr. Fox, identify the specific work and quantify how you have priced it. If Grunley-Walsh ever provided the Park Service a change with the lack of information included in Modification No. 10, the Park Service would reject it outright with no response. You know full well the Park Service has demanded excruciating detail for add and credit change proposal Grunley-Walsh has ever submitted. What makes the Park Service above this requirement for their own claims?

Likewise, Modification No. 10 fails to provide any explanation whatsoever as to why the Government is entitled to a $190,000 deduct for the alleged non-conforming sidewalk work. The price charged by Cherry to remove and replace the 15th Street sidewalks was $12.22 per square foot (including overhead and profit) (see CHC proposal in **EXHIBIT 2**). Assuming the additional 26 panels are each approximately 120 square feet in size, to replace the 26 additional panels should not cost more than $39,000. Likewise, assuming all 3,275 square feet of the 15th Street sidewalk needed replacement, the cost to the government for this work should not be more than $40,000. Combined, the cost to replace the total alleged non-conforming sidewalks should

total no more than $80,000; not $190,000. Perhaps, in your final decision, you will explain why the Government is entitled to an amount that is nearly 150% greater than the cost of the work.

Even more troubling is the fact your unilateral change order was issued without any prior discussion or consultation with Grunley-Walsh. I personally, spoke with you on the phone on January 29, 2007 (just 11 days prior to the issuance of Modification No. 10). I inquired about settling all of, or at least part of, the issues on the project. I told you the impact of these unresolved matters was creating a serious financial problem for Grunley-Walsh was well as our subcontractors. I even offered to fly to Denver for the specific purpose of meeting with you to settle as many issues that could be settled.

Mike, perhaps you are unhappy with the work we performed. Or perhaps you are angry about the fact that we chose not to replace any more sidewalks. Whatever the reason, your unilateral issuance of Modification No. 10 in my mind does nothing to foster cooperation. In fact all it does is foster an atmosphere of mistrust. I question who is really calling the shots on your end. In our nearly 5 years of having worked together, I certainly would never have expected such action from you. Neither would I have expected what now appears to be a sense of indifference on your part as to whether Grunley-Walsh is being treated fairly.

I hope this was not your intent. However, you should know that your recent administration of our contract has had the punitive financial impact apparently intended and is now demonstrably being driven home with the issuance of your disingenuous deductive Modification for $210,000.[3]

[3] We note Modification No. 10, comes on the heels of the Park Service's refusal to process payment on our invoice for the amounts settled in Modification No. 9. It also follows the Park Service's implementation of retainage on earned contract sums – something that has never been invoked for the 10 years we have been working for the Park Service at the Washington Monument.

**Certification**

In accordance with the Contract Disputes Act:

I certify that this claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amounts requested accurately reflect the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the Contractor.

**GRUNLEY-WALSH, LLC.**

Bassem Soueidan
Operations Manager

Enclosures
cc: Roger C. Jones, Esquire (w/encls.)
Cherry Hill Construction
Davey Tree