**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **GRUNLEY-WALSH, LLC** | ) | |
| **(f/k/a Grunley-Walsh Construction JV** | ) | **Judge: Charles F. Lettow** |
| | ) | |
| **Plaintiff,** | ) | **Case Nos. 06-721C, 06-723C,** |
| | ) | **06-815C, 06-816C, 06-837C** |
| **v.** | ) | **07-85C, 07-189C, 07-190C,** |
| | ) | **07-197C, 07-200C, 07-281,** |
| | ) | **07-390C, 07-391C** |
| | ) | **(Consolidated)** |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**JOINT PRELIMINARY STATUS REPORT**

Pursuant to Rule 16 and Appendix A of the Rules of the United States Court of Federal Claims, plaintiff Grunley-Walsh, LLC and defendant, the United States, by their representative attorneys, respectfully submit this Joint Preliminary Status Report:

**a. Does the Court have jurisdiction over the action?**

Plaintiff states that the Court has jurisdiction to consider and decide this action. Defendant is not aware of a basis upon which to challenge the Court's jurisdiction at this time.

**b. Should the case be consolidated with any other case and, if so, why?**

These cases have been consolidated pursuant to the Court's Orders of March 14, 2007, May 31, 2007, and July 5, 2007.

**c. Should trial of liability and damages be bifurcated?**

The parties do not believe that bifurcation of liability and damages is appropriate.

**d. Should further proceedings in this case be deferred pending consideration of another case before this Court or any other tribunal?**

The parties do not believe deferral is appropriate at this time.

**e. Will a remand or suspension be sought?**

Neither party seeks remand or suspension.

**f. Will additional parties be joined?**

Neither party intends to join additional parties at this time.

**g. Does either party intend to file a motion(s) pursuant to RCFC 12(b), 12(e), or 56 and, if so, a schedule for intended filing?**

Plaintiff does not intend to file a motion pursuant to RCFC 12(b), 12(e), or 56. Defendant does not intend to file a motion pursuant to RCFC 12(e) or 12(b), and has not determined whether it intends to file a motion pursuant to 56 at this time.

**h. What are the relevant factual and legal issues?**

**Background**

On May 13, 1998, the Department of the Interior, National Park Service, awarded Grunley-Walsh Contract No. 1443CX305998901. Pursuant to Modification No. 7 to Contract No. 1443CX305998901, which was effective November 15, 2001, the General Provisions of the contract were deleted and were replaced with revised contract clauses, including provisions of the Federal Acquisition Regulation ("FAR"). In addition, Modification No. 7 revised the scope of Contract No. 1443CX305998901 to allow for design-build services for structures ensuring and maintaining the physical security of the Washington Monument.

On March 14, 2002, the contracting officer for Contract No. 1443CX305998901 issued Task Order T3059989125 ("Task Order 25"), pursuant to which Grunley-Walsh was to provide a Cultural Landscape Report and Historic Structures Report for the Washington Monument and surrounding grounds. On April 11, 2002, the contracting officer for Contract No. 1443CX305998901 issued Task Order T3059989128 ("Task Order 28"), pursuant to which

Grunley-Walsh was to provide all labor, equipment, and supplies necessary to develop preliminary design documents for the design of an underground visitor screening facility and a vehicle barrier system for the Washington Monument. On July 29, 2002, the contracting officer issued Task Order T3059981130 ("Task Order 30") for cost estimating and exhibit design services for the Washington Monument Underground Visitor Screening Facility. On November 6, 2002, the contracting officer issued Task Order T3059981131 ("Task Order 31") for additional screening team costs. On January 2, 2003, the contracting officer issued Task Order T3059981132 ("Task Order 32") for additional design team presentations to National Capitol Planning Commission ("NCPC") and the Commission of Fine Arts ("CFA"). On June 30, 2003, the contracting officer for Contract No. 1443CX305998901 issued Task Order T3059981133 ("Task Order 33"), pursuant to which Grunley-Walsh was to perform services related to a "leed" environmental analysis, and prepare measured drawings of the Monument Lodge structure. On December 5, 2003, the contracting officer issued Task Order T305998135 ("Task Order 35"), pursuant to which Grunley-Walsh was to construct and install an above-ground vehicle security barrier system and perform related work for the Washington Monument.

These consolidated cases address whether Grunley-Walsh is entitled to equitable adjustments for work that occurred during Grunley-Walsh's performance of Task Order 35. These cases also address whether Grunley-Walsh is entitled to equitable adjustments for A/E work that occurred during Grunley-Walsh's performance of Task Orders 28. The cases also address whether Grunley-Walsh is entitled to payment under the contract for work that Grunley-Walsh contends was performed under Task Orders 25, 28, and 33, and whether Grunley-Walsh is entitled to payment for certain unpaid subcontractor invoices submitted under Task Order 28. In addition, these cases address whether the Government breached the contract by deducting

$210,000 pursuant to Modification 10 to Task Order 35 for work that the Government contends was non-conforming.

**The parties jointly identify the following relevant factual and legal issues:**

1. Whether Grunley-Walsh is entitled to an equitable adjustment for clean-up and assessment work performed pursuant to Contracting Officer Directives Nos. 1 and 2, and if so, in what amount?

2. Whether Grunley-Walsh is entitled to an equitable adjustment for work relating to the construction of an irrigation system and the irrigation of sod, and if so, in what amount?

3. Whether Grunley-Walsh is entitled to an equitable adjustment for installation of a PEPCO electrical line, and if so, in what amount?

4. Whether Grunley-Walsh is entitled to an equitable adjustment for work in the Monument Lodge area of the project, and if so, in what amount?

5. Whether Grunley-Walsh is entitled to an equitable adjustment for differing site conditions based upon unsuitable soils in the Monument Lodge area and south, northeast and northwest of the Monument, and if so, in what amount?

6. Whether Grunley-Walsh is entitled to equitable adjustments for the adjustment, relocation, and accommodation of underground utilities as set forth in RCO 950.09, RCO 950.86, RCO 951.51, RCO 951.60, RCO 951.63, RCO 951.64, RCO 951.65, and RCO 950.19.04, and if so, in what amounts.?

7. Whether Grunley-Walsh is entitled to equitable adjustments for the tie-in of new sidewalks and landscape with the existing grades, sidewalks and utilities at the area south of the intersection of Constitution Avenue and 16th Street, including costs to “marry” the new grades

with the existing grades, to revise the drainage in the area and to adjust the existing utilities in the area, and if so, in what amounts?

8. Whether Grunley-Walsh is entitled to equitable adjustments for installing additional drainage in the Southeast area of the project and relocating a storm drain inlet in the Southwest area of the project, and if so, in what amounts?

9. Whether Grunley-Walsh is entitled to an equitable adjustment for installing a concrete bridge over an underground abandoned tunnel in order to place footings for a new security wall, and if so, in what amount?

10. Whether Grunley-Walsh is entitled to equitable adjustments for installing a concrete bridge over an underground tunnel running from an existing utility vault to the basement of the Monument, and for chipping away an existing tunnel/vault slab, and if so, in what amounts?

11. Whether Grunley-Walsh is entitled to an equitable adjustment for removing brick and mortar around an existing tunnel / vault in order to provide new paving at the Monument Plaza, and if so, in what amount?

12. Whether Grunley-Walsh is entitled to an equitable adjustment for removing stone and concrete to install new plaza slabs around the base of the Monument, and if so, in what amount?

13. Whether Grunley-Walsh is entitled to an equitable adjustment for removing asphalt and adjusting the elevation of existing DC WASA vaults so that sidewalks could be poured and placed at the Northwest side of the project, and if so, in what amount?

14. Whether Grunley-Walsh is entitled to an equitable adjustment for painting slot/trench drains in areas where sidewalk security bollards were to be installed, and if so, in what amount?

15. Whether Grunley-Walsh is entitled to an equitable adjustment for removal of an existing piece of stone veneer, chipping away concrete and manufacture and replacement of stone veneer to mount bollard control boxes in the wall adjacent to the bollards, and if so, in what amount?

16. Whether Grunley-Walsh is entitled to equitable adjustments for revising drainage, excavation and removal of old drainage lines and inlets, and grading in the area of the project near the Sylvan Theater, and if so, in what amounts?

17. Whether Grunley-Walsh is entitled to equitable adjustments for removing and replacing existing stone at handicap ramps, and if so, in what amounts?

18. Whether the Government is entitled to a credit for handicap ramps that were not demolished and replaced, and if so, in what amount?

19. Whether Grunley-Walsh is entitled to payment in the amount of $37,607.49 for completion of Historic Structures and Cultural Landscape Reports pursuant to Task Order 25?

20. Whether Grunley-Walsh is entitled to payment in the amount of $14,603.64 for Lighting Redesign Work and Lodge Rehabilitation Design Work pursuant to Task Order 28?

21. Whether Grunley-Walsh is entitled to payment in the amount of $6,389 for the preparation of measured drawings of the Monument Lodge structure pursuant to Task Order 33?

22. Whether Grunley-Walsh is entitled to an equitable adjustment for A/E services for design changes to the irrigation system, and if so, in what amount?

23. Whether Grunley-Walsh is entitled to an equitable adjustment for A/E services for engineering services to adjust the DC WASA stop log, and if so, in what amount?

24. Whether Grunley-Walsh is entitled to an equitable adjustment for A/E services relating to design services and construction documents relating to "wayfinding" signage, and if so, in what amount?

25. Whether Grunley-Walsh is entitled to an equitable adjustment for A/E services relating to redesign of the plaza behind the Monument Lodge, design of additional wall lighting at the Monument Lodge horseshoe wall, design documentation for the German American Friendship Garden area, and design work relating to the Sylvan Theater plaza, and if so, in what amounts?

26. Whether Grunley-Walsh is entitled to equitable adjustments from the Government for unpaid invoices to its subcontractors/vendors associated with A/E services, and if so, in what amounts?

27. Whether Grunley-Walsh is entitled to an equitable adjustment for services relating to the A/E services, and if so, in what amount?

28. Whether there was a mutual mistake regarding the topsoil work to be performed pursuant to Task Order 35 at the time that Task Order 35 was issued, whether Grunley-Walsh is entitled to contract reformation as a result of this mutual mistake, and if so, how the contract should be reformed?

29. Whether Grunley-Walsh is entitled to an equitable adjustment for topsoil work performed pursuant to Task Order 35, and if so, in what amount?

30. Whether Modification No. 10 to Task Order 35, which deducted $190,000 for 26 cracked sidewalk panels that the Government contends are non-conforming and $20,000 for

irrigation work that the Government contends is non-conforming, constitutes a breach of contract, and if so, what damages Grunley-Walsh is entitled to as a result of such breach?

31. Whether Grunley-Walsh has already been compensated for the work for which it claims equitable adjustments under the contract and modifications to the contract?

**Plaintiff identifies the following additional relevant factual and legal issues:**

**1. CASE NO. 06-721**
**(SURVEY LODGE FLOOD DAMAGE CLAIM - $183,409)**

1. Whether the Olin Partnership was issued existing background drawings by the National Park Service in order to prepare the November 25, 2003 construction drawings and to identify the work required in Task Order No. 35?

2. Whether the National Park Service drawings that were transmitted to Grunley-Walsh entitled "Schematic Design, Design Development, and Supplemental Services for the Washington Monument Vehicle Barrier System and Underground Visitor Screening Facility" were expected to be used for the preparation of construction drawings and to identify work required for Task Order 35 work as well as for Task Order 28 work?

3. Whether during design development, the Park Service indicated the underground tunnel located under the work area needed to be preserved or protected when construction started?

4. Whether the scope of work set forth in Task Order No. 35 required work in connection with the underground power tunnel?

5. Whether the grading work disturbed the underground tunnel which was located several feet (below the surface) beneath the grading operation?

6. Whether the project was subjected to an extraordinary rain storm that caused considerable local flooding during the July 4th holiday of 2004?

7. Whether the National Park Service provided to Grunley-Walsh a Contracting Officer Directive No. 1 – Survey Lodge Cleanup ("Directive No. 1") and a Contracting Officer Directive No. 2 – Tunnel Opening ("Directive No. 2") pursuant to the Changes clause in the Contract?

8. Whether Grunley-Walsh was responsible for maintaining the project site and whether that responsibility made Grunley-Walsh responsible for the work performed pursuant to Directive No. 1 and Directive No. 2?

9. Whether there is any evidence of where/how flooding would have occurred in the underground tunnel and/or how flooding would have entered the Survey Lodge basement via the tunnel?

10. Whether the work performed pursuant to the Contracting Officer's Directive Nos. 1 and 2 was change work?

11. Whether Grunley-Walsh caused the damage to the Survey Lodge?

12. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $183,409 for the costs claimed in this case?

**2. CASE NO. 06-723**
**<u>(IRRIGATION CHANGE CLAIM - $742,452)</u>**

1. Whether the November 25, 2003 drawings and specifications contained design information for the construction of a landscape irrigation system?

2. Whether Grunley-Walsh included an "allowance" amount of $338,000, for an irrigation system, in their price proposal of $13,993,216 for the Task Order No. 35 work?

3. Whether Grunley-Walsh was responsible for the irrigation system pursuant to Task Order No. 28?

4. Whether the May 2003 100% Design Development documents for the Project were issued for construction purposes and whether they were documents on which Task Order No. 35 was premised?

5. Whether the May 2003 100% Design Development documents for the Project included an irrigation design?

6. Whether the irrigation system contemplated in the 100% Design Development documents was too expensive for the Government's budget?

7. Whether the redesign of the irrigation system was for an established price?

8. Whether the parties understood the allowance for the irrigation system was premised on providing a very basic, open field, irrigation system with no "bells or whistles?"

9. Whether the parties contemplated the $338,000 allowance would be applied towards the cost of the change work to install the irrigation system which was being redesigned to suit the Government's needs and budget?

10. Whether the allowance of $338,000 was a "guaranteed maximum price" for the irrigation system?

11. Whether the parties understood the estimated cost to perform the irrigation work as contemplated by the September 25, 2004 revised drawings and specifications was $500,000 (not including the booster pump and associated electrical systems that would be required for the system)?

12. Whether unforeseen building foundations were found while performing the irrigation work which required excavation and disposal of tons of concrete debris?

13. Whether the building foundations were depicted on the background drawings initially provided by the Park Service for design purposes, including the design of the irrigation system?

14. Whether Grunley-Walsh should have discovered the building foundations pursuant to Task Order 22 under which Grunley-Walsh was to perform "Supplemental Services for Geotechnical Investigation, Site Survey, and Core Drilling Supporting the Washington Monument Physical Security System?

15. Whether the Government delayed its decision regarding the water supply and booster pumps for the irrigation system?

16. Whether Grunley-Walsh had to install bypass lines as a temporary work-around so the irrigation system could be started because of the Government's indecision on the water supply and booster pumps?

17. Whether the installed bypass lines resulted in a much slower water supply than was contemplated in the irrigation system design?

18. Whether the water supply for the installed irrigation system was sufficient to provide the irrigation needed so that newly installed sod would not immediately burn and die in the 90° temperatures that are often experienced in Washington during the summer months?

19. Whether the water cannons which the Government had planned on utilizing for the new irrigation system were inadequate?

20. Whether it was Grunley-Walsh's responsibility to provide supplemental irrigation for the sod with fire hoses?

21. Whether the cost to perform the irrigation work was far greater than $500,000 because of the unforeseen building foundation work, the installation of bypass lines made

necessary by Government indecision on the water supply, and the work to supply supplemental irrigation because the bypass lines resulted in a slow water supply?

22. Whether the Government was fully aware of the additional costs being incurred and the problems encountered while performing the irrigation work?

23. Whether Grunley-Walsh submitted to the Government the updated costs to perform the irrigation change work on a continual basis?

24. Whether the unforeseen building foundation work, the installation of bypass lines made necessary by Government indecision on the water supply, and the work to supply supplemental irrigation because the bypass lines resulted in a slow water supply was change work?

25. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $742,452 for the costs claimed in this case?

**3. CASE NO. 06-815**
**(PEPCO LINE CLAIM - $38,428)**

1. Whether the Olin Partnership was issued existing background drawings by the National Park Service in order to prepare the November 25, 2003 construction drawings and to identify the work required in Task Order No. 35?

2. Whether the National Park Service drawings that were transmitted to Grunley-Walsh entitled "Schematic Design, Design Development, and Supplemental Services for the Washington Monument Vehicle Barrier System and Underground Visitor Screening Facility" were expected to be used for the preparation of construction drawings and to identify work required for Task Order 35 work as well as for Task Order 28 work?

3. Whether the existing PEPCO electrical line that conflicted with the wall footing was in a deteriorated condition?

4. Whether PEPCO required a new line to be installed because of its deteriorated condition, rather than a simple lowering of the line?

5. Whether Grunley-Walsh hit the existing PEPCO line causing the deteriorated condition of the line and the line replacement in the section damaged?

6. Whether the Task Orders required Grunley-Walsh or the Olin Partnership to confirm whether the representations made by the National Park Service regarding the location of underground utilities were correct?

7. Whether the affirmative representations in the drawings provided by the National Park Service regarding the location of the utility lines near the location of the Monument Lodge reasonably induced Grunley-Walsh and its subcontractors into believing no electrical line would be encountered where the existing PEPCO line was actually located?

8. Whether the relocation of the PEPCO line is part of the contract requirements or constitutes a change to the contract?

9. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $38,428 for the costs claimed in this case?

**4. CASE NO. 06-816**
**(MONUMENT LODGE SITE IMPROVEMENTS CLAIM – $60,708)**

1. Whether the November 25, 2003 Task Order No. 35 contract drawings contained information or details about what was to be constructed behind the Monument Lodge?

2. Whether the contract drawings indicated the work behind the Monument Lodge was "not in contract?"

3. Whether at the time Task Order No. 35 was issued, the Park Service was uncertain as to whether the area behind the Monument Lodge would be used for the purpose of constructing an underground visitor center?

4. Whether the contract drawings depicted the horseshoe shaped wall in plain view, but did not provide elevations or cross section details of the Monument Lodge wall?

5. Whether, pursuant to the Park Service's June 22, 2004 letter, work on the Monument Lodge wall area of the project remained on hold during the months of June, July, August and September 2004 while the Park Service decided upon a scope of work in the Monument Lodge area of the project?

6. Whether the Park Service's letter dated October 20, 2004 indicated the Park Service was preparing a scope of work for the Monument Lodge site work and the work would be issued under the Changes clause of the contract?

7. Whether Drawing Sheet L4.16 issued on May 10, 2005, for the first time, depicted planter beds being installed at the rear of the existing Monument Lodge?

8. Whether Drawing Sheet L5.5 issued on May 10, 2005, for the first time, depicted a concrete paving pattern and drain locations in the area between the rear of the Monument Lodge?

9. Whether construction details and elevations, remained missing from the May 10, 2005 drawings?

10. Whether a revised set of drawings was issued on June 3, 2005**,** changed the planting bed configuration behind the Monument Lodge and provided all the necessary information to install underground drains and to pave the rear area of the Monument Lodge (where the Visitor's Center was originally planned to be constructed) with sidewalk like concrete?

11. Whether the installation of the drainage system, the installation of and spreading a stone base and the pouring of concrete in accordance with the paving pattern that had been provided on the June 3, 2005 drawings constituted a change to the contract?

12. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $60,708 for the costs claimed in this case?

**5. CASE NO. 06-837**
**(UNDERCUT & BACKFILL UNSUITABLE SOILS CLAIM - $56,919)**

1. Whether the Olin Partnership was issued existing background drawings by the National Park Service in order to prepare the November 25, 2003 construction drawings and to identify the work required in Task Order No. 35?

2. Whether the National Park Service drawings that were transmitted to Grunley-Walsh entitled "Schematic Design, Design Development, and Supplemental Services for the Washington Monument Vehicle Barrier System and Underground Visitor Screening Facility" were expected to be used for the preparation of construction drawings and to identify work required for Task Order 35 work as well as for Task Order 28 work?

3. Whether the background drawings provided by the Park Service provided information concerning the existing subsurface soil conditions at the Project?

4. Whether the undercut, removal and backfill work that is the subject of this action is for the same type of undercut, removal and backfill work as had been approved in previous modifications to the contract, but in a different area?

5. Whether unsuitable soils were discovered at sidewalk areas - primarily at the South and Southeast side of the Project - in or about early February 2005?

6. Whether at an on-site meeting with Mr. Sims, the Government asked Grunley Walsh's subcontractor, Cherry Hill, for recommendations as to how to address the problem?

7. Whether it was at this meeting that the Government directed Grunley-Walsh / Cherry Hill to perform the undercut and backfill work in question?

8. Whether the unsuitable soil problem in the areas adjacent to the Monument Lodge was exacerbated by the Government's desire to have these areas of the Project open by March 1, 2005 (for public access to the Monument)?

9. Whether the winter is one of the worst times to perform grading work?

10. Whether the Government issued a change directive relating to undercutting and backfilling work for small sections of sidewalk sub-grade southwest of the Monument Lodge and northwest of the Monument itself?

11. Whether the Government issued a change directive relating to undercutting and backfilling work for small sections of sidewalk sub-grade south and northeast of the Monument itself?

12. Whether the undercutting and backfill work adjacent to the Monument Lodge was the result of Grunley-Walsh's and its subcontractor's failure to properly protect the site?

13. Whether the work related to the undercutting, removal and replacement of unsuitable soils on the Project was change work?

14. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $56,919 for the costs claimed in this case?

**6. CASE NO. 06-85**
**(ADJUSTMENT OF SITE UTILITIES CLAIM – 134,179)**

1. Whether the Olin Partnership was issued existing background drawings by the National Park Service in order to prepare the November 25, 2003 construction drawings and to identify the work required in Task Order No. 35?

2. Whether the National Park Service drawings that were transmitted to Grunley-Walsh entitled "Schematic Design, Design Development, and Supplemental Services for the Washington Monument Vehicle Barrier System and Underground Visitor Screening Facility" were expected to be used for the preparation of construction drawings and to identify work required for Task Order 35 work as well as for Task Order 28 work?

3. Whether the background drawings provided by the Park Service provided information about the buried depth (i.e. elevation) of the existing utilities?

4. Whether many of the existing utilities had to be adjusted, relocated, worked around and/or regraded to accommodate the contract work being performed?

5. Whether the NPS recognized the adjustment of existing site utilities to be a change to Grunley-Walsh's Task Order No. 35 work in Modification Nos. 6 (Item D), 7 (Item K) and 8 (Item A.11)?

6. Whether Grunley-Walsh reasonably relied upon this course of dealing in believing they would be provided an equitable adjustment for other adjustments of site utilities, when and if they were encountered given the prior course of dealing concerning this type of change work, and because the Contract contained a standard Government Changes clause.

7. Whether the work performed by Grunley-Walsh relating to the following site utility adjustment issues was change work:

| | |
|---|---|
| RCO 950.09 | Incorporate 2 Way 2" Fiber Optic Ductbank Not Originally Shown |
| RCO 950.86 | Relocate Existing 6" Water Line at Sylvan Theatre |
| RCO 951.51 | Grade/Fill Southeast of Monument Over Existing Water Line |
| RCO 951.60 | Lower Existing Water Line Northeast of Monument |
| RCO 951.63 | Adjust 2" Fire Line at South Side of Monument |
| RCO 951.64 | Resolve Conflict Between Existing Phone Line and MH D-3 |
| RCO 951.65 | Adjust / Repair Water Line South Along Fence |
| RCO 950.19.04 | Adjustment of Existing Utilities 4/14/04 – 6/29/05? |

8. Whether the existing 6" water line at the Sylvan Theatre (RCO 950.86) conflicted with the new proposed grading and a storm drain line, and whether more than 240' of water line had to be relocated due to this conflict?

9. Whether in the North/East section of the project more than 200 feet of another 6" water line had to be relocated/lowered because of a conflict with the new proposed grade?

10. Whether the following other adjustments were necessary because the background drawings did not depict the utilities' existing elevation and they conflicted with the new proposed grade:

> RCO 950.19.04 - raising and/or adjusting numerous manholes and valves; RCO 951.51 - adding more grade to cover an existing water line; RCO 950.09 - relocating an existing fiber optic cable not shown on the background drawings and the November 2003 bid drawings (but subsequently shown on the January 22, 2004 drawing set); RCO 951.64 - working around a PEPCO power line at Manhole D-3; RCO 951.63 - adjusting a 2" fire hose water line; and RCO 951.65 - adjusting/repairing a 6" water line at the South side of the project next to the fence at the Sylvan Theatre?

11. Whether the cost of adjusting the site utilities in question would have been included in the base contract amount if the background drawings provided by the NPS contained elevation information?

12. Whether it was Grunley-Walsh's responsibility as part of the design process to do an analysis of the existing utilities to determine whether their buried depth would conflict with the proposed new grades?

13. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $134,179 for the costs claimed in this case?

**7. CASE NO. 06-189**
**(CONSTITUTION AVENUE TIE-IN CLAIM – $12,244)**

1. With respect to the area of the Project just south of the Constitution Avenue and 16th Street intersection (around the German American Friendship Gardens), whether the Park Service radically changed the design for this area; creating new sidewalks, new landscape areas and a new pull-off area where the 16th street parking lot entrance used to exist.

2. Whether Modification No. 7 to Task Order 35 provided compensation for "marrying" the grades outside of the sidewalks to the new grades for the sidewalks and for adjusting the existing utilities to the new grades and existing landscape conditions (e.g. tree roots, etc.).

3. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $12,244 for the costs claimed in this case?

**8. CASE NO. 06-190**
**(STORM DRAINAGE REVISIONS CLAIM - $25,546)**

1. Whether at the time the Task Order No. 35 contract drawings were issued in November of 2003, they did not contain any civil engineering drawings and they did not show the piping for the storm drains; nor did they show all of the required storm drains that were ultimately required.

2. Whether it was not until the civil engineering drawings were issued on March 19, 2004, that the majority of this additional information was provided?

3. Whether at the Southeast area of the Project, the contract drawings simply showed one existing storm drain to remain?

4. Whether when the civil engineering drawings were finally issued, an additional storm drain line was added; running in a Southwest direction from the Monument Lodge?

5. Whether after the issuance of the civil engineering drawings, it was determined that additional drainage was needed in the Southeast area of the project?

6. Whether with regard to the Southwest area of the Project, the storm drain inlets were not depicted on the November 2003 contract drawings?

7. Whether when the March 19, 2004 civil drawings were issued, they depicted a storm drain inlet in the same vicinity as an abandoned tunnel running from the Survey Lodge (located outside the contract limit line in the Southwest area of the Project) to the base of the Monument?

8. Whether due to the conflict created by the abandoned underground tunnel, Grunley-Walsh submitted an RFI to the Civil Engineer on July 24, 2004 suggesting that Drain Inlet D-2 be eliminated?

9. Whether in response to the RFI, the Civil Engineer issued a revised drawing on July 26, 2004 that moved Drain Inlet D-2 to the Northeast in order to avoid the conflict with the abandoned tunnel?

10. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $25,546 for the costs claimed in this case?

**9. CASE NO. 06-197**
**(DIFFERING SITE CONDITIONS CLAIM - $21,379)**

1. Whether the background drawings provided by the Park Service provided information concerning the existing subsurface conditions at the Project?

2. Whether Grunley-Walsh was compensated for other similar unforeseen differing site utility conditions "not shown on the background drawings?"

3. Whether the existing condition of the power tunnel, since de-activation, was unknown to all parties?

4. Whether during design development, the Park Service made any indication the tunnel needed to be preserved or protected when construction started?

5. Whether the scope of work set forth in Task Order No. 35 required any work in connection with this abandoned power tunnel?

6. Whether the background drawings show the existence of a second tunnel?

7. Whether the vault was structurally unstable and the vault roof required a new reinforced concrete slab?

8. Whether due to the existence of these unforeseen differing conditions, the existing tunnel / vault slab had to be chipped away and a new concrete bridge had to be installed over the existing tunnel as well as the adjacent tunnel vault containing steam pipe?

9. Whether to continue with the new paving at the Monument Plaza, brick and mortar around the existing tunnel / vault had to be removed?

10. Whether stone and concrete had to be removed in order to install the new plaza slabs around the base of the monument?

11. Whether two existing DC WASA vaults were depicted on the background drawings?

12. Whether the vaults conflicted with the installation of the new sidewalks at the Northwest side of the Project?

13. Whether there was not enough time to effect a new design to adjust/lower the vault to avoid conflict with the new sidewalks prior to the planned July 4, 2005 re-opening celebration?

14. Whether the Park Service decided to cover the existing vaults with asphalt so the opening celebration could take place?

15. Whether after the July 4th re-opening celebration, the asphalt had to be removed and the elevation of the existing vaults had to be adjusted so the new sidewalks could be poured and placed in this area?

16. Whether this work, which stemmed from the unforeseen differing condition relating to the existing vaults, was compensated for in Modification No. 8?

17. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $21,379 for the costs claimed in this case?

**10. CASE NO. 06-200**
**(NOT IN CONTRACT CHANGE WORK CLAIM – $25,702)**

1. Whether during the course of the Project, the Park Service representatives directed numerous items of change work on an "ad hoc" basis, often as work was being performed?

2. Whether the Task Order 35 contract documents provided specifications for the type of finished appearance for the slot / trench drains?

3. Whether at the June 1, 2005 Project Meeting, the Park Service confirmed their direction that all storm drain grates, surrounded by concrete or stone, had to be primed and painted black?

4. Whether at the meeting, the Park Service recognized this to be a change?

5. Whether when Task Order No. 35 was issued, the contract drawings indicated the existence of security bollards in the sidewalks at the Northwest, Southwest, Northeast and Southeast locations, but the drawings did not indicate how the bollards were to be controlled?

6. Whether after Task Order No. 35 was awarded, a new set of drawings was issued on February 27, 2004 indicating the sidewalk security bollards would be hydraulically controlled from a pump vault located in the ground several feet from the bollards?

7. Whether by letter dated July 27, 2004, the Contracting Officer defined the work / performance requirements for the new sidewalk security bollards to be installed?

8. Whether Modification No. 5 incorporated the requirements for the operable bollards, specifically referencing the Contracting Officer's July 27, 2004 letter?

9. Whether Modification No. 5 made part of the Contract the specification requirements for the bollard system, set forth in the Contracting Officer's letter dated July 27, 2004?

10. Whether several months after the issuance of the Contracting Officer's July 27, 2004 letter, the Park Police (through the Park Service) requested the bollard control boxes be mounted in the wall adjacent to the bollards – as opposed to being in a ground vault?

11. Whether on January 13, 2005, a design sketch was issued depicting the location for the bollard control box in the wall adjacent to the bollards and a revised sketch was issued on May 12, 2005 which required a stone veneer finish on the bollard control box cover?

12. Whether by January 2005 the walls in question had been constructed and the stone veneer had been set in place and as such, to mount the bollard control boxes in the wall, an existing piece of stone veneer had to be removed, the concrete behind the stone veneer had to be chipped away in order to accommodate the bollard control box and a new piece of stone veneer had to be manufactured for the control box cover?

13. Whether in April of 2005, as site work around the Sylvan Theatre was proceeding, a leak in an existing water line valve located near a sidewalk water fountain to the Southwest of the Sylvan Theatre was discovered?

14. Whether the Park Service directed Grunley-Walsh repair / replacement the waterline valve to stop the leaking and water drainage from the leak?

15. Whether at the time Task Order No. 35 was issued, the grading plans, depicted on drawing sheets L5.1 and L5.2, ended at the new security wall running past the front of the Sylvan Theatre stage?

16. Whether due to the existing contours in this area, the drainage in front of the Sylvan Theatre stage needed to be revised to prevent flooding?

17. Whether at the direction of the Park Service, to revise the drainage, test pits had to be dug to determine the exact location of existing utilities, the existing drain lines and inlets had to be excavated and removed, the new drain lines and a new drain inlet had to be installed, and the area had to be regarded?

18. Whether the Task Order No. 35 contract demolition drawings excluded from demolition an area along 15th street where two different stone handicap ramps existed?

19. Whether because the existing handicap ramps were severally cracked and deteriorated, the Park Service directed that the existing stone at the handicap ramps be removed and replaced?

20. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $25,702 for the costs claimed in this case?

**11. CASE NO. 06-281**
**(A/E ADDITIONAL FEES CLAIM - $525,301)**

1. Whether the scope of work required by Task Orders 19 through 33 did not include providing A/E services relating to: (1) the preparation of construction documents; (2) construction administration services; (3) attending construction phase meetings; and/or (4) providing additional design services beyond the scope of Task Orders 19 through 33?

2. Whether the construction work required by Task Order 35 could not be performed without the additional A/E services referenced in issue 1?

3. Whether Grunley-Walsh was instructed to submit invoices for A/E services in payment applications for Task Order No. 28?

4. Whether the Park Service's payment of A/E invoices under Task Order No. 28 established a course of dealing and an acknowledgement that such services represented a constructive change to the Contract for which Grunley-Walsh was entitled to payment?

5. Whether when the Park Service made the decision not to utilize the Tidal Basin as a water source for the irrigation system, Grunley-Walsh was asked to provide a design for an alternative water source which included coordination with various regulatory agencies, DCWASA and PEPCO, submissions for service class upgrades and required a redesign of the irrigation water supply drawings to include a new type of pump vault station, wiring layouts, and coordination of the final locations of the RPZ, vaults, and power source?

6. Whether Grunley-Walsh is entitled to payment for the work performed by Geoconcepts Engineering / Geo Services Corp in the amount of $101,630.57 for construction engineering services performed on and off site, primarily for soil and concrete testing/analysis.

7. Whether Grunley-Walsh is entitled to payment for the work performed by Joseph R. Loring & Associates in the amount of $14,070.46 for: (1) an unpaid (omitted) invoice in the

amount of $3,519.60 relating to design development work for the relocation of an existing GSA steam tunnel that was expected to conflict with the proposed underground Visitor Screening Facility; and (2) $10,550.86 relating to preparation and coordination of design and construction documents for the electrical aspects of the irrigation system finally required by the Park Service?

8. Whether Grunley-Walsh is entitled to payment for the work performed by Lynch & Associates, Ltd. in the amount of $17,621.00 for: (1) unpaid services for the preparation and coordination of design and construction documents for the irrigation system finally required by the Park Service; and (2) construction administration services relating to the actual installation of the irrigation system?

9. Whether Grunley-Walsh is entitled to payment for the work performed by Olin Partnersip in the amount of $167,952.22 for: (1) preparation of construction documents/drawings; (2) the performance of additional design services as outlined in the September 8, 2005 Grunley-Walsh cost submission; (3) the performance of construction administration services; and (4) the attendance at numerous project meetings during the construction phase of the project?

10. Whether Grunley-Walsh is entitled to payment for the work performed by Thornton Thomasetti Cutts / Group in the amount of $13,102.58 for: (1) design development work for the relocation of the existing GSA steam tunnel that was expected to conflict with the proposed underground Visitor Screening Facility; (2) the performance of construction administration services; and (3) the attendance at numerous project meetings during the construction phase of the project?

11. Whether Grunley-Walsh is entitled to payment for the work performed by Wiles Mensch (n/k/a Edwards & Kelcey) in the amount of $98,325.38 for: (1) design development

work for the relocation of the existing GSA steam tunnel that was expected to conflict with the proposed underground Visitor Screening Facility; (2) the preparation of construction documents / drawings; (3) the performance of construction administration services; (4) the attendance at numerous project meetings during the construction phase of the project; (5) the design costs (i.e. $42,295) for the irrigation redesign work (including the design costs of Thornton, Thomasetti, Cutts – acting as their subconsultant); and (6) the design costs (i.e. $5,002.26) relating to the lowering of an existing DCWASA stop log system.

12. Whether Grunley-Walsh is entitled to payment for the work performed by Joel Katz Design in the amount of $9,660.00 for preparing the construction documents relating to the "wayfinding" signage.

13. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $525,301 for the costs claimed in this case?

**12. CASE NO. 06-390**
**(<u>TOP SOIL CHANGE WORK CLAIM - $259,863</u>)**

1. Whether the contract documents reflect the parties' agreement with respect to the top soil work in Task Order 35.

2. Whether the Contracting Officer's Final Decision confirms the parties' mutual mistake regarding the top soil work.

3. Whether based on the criteria in the specifications, the amount of sand to be mixed with organic material was going to be an unusually high percentage and was also going to add significant cost to the price for the actual landscaping construction work?

4. Whether the Park Service requested suggestions for reducing the price of the top soil?

5. Whether Grunley-Walsh provided an alternative bid to the Park Service that contemplated a topsoil sand mix of not less than 15%; nor more than 50%.

6. Whether the Park Service agreed with the topsoil alternative because of the significant price saving that would be achieved?

7. Whether on November 25, 2003, Grunley-Walsh submitted its price proposal in the amount of $3,185,864 which included the alternative topsoil mixture?

8. Whether as a result of the parties' negotiations, on Wednesday, November 26, 2003, Grunley-Walsh provided/emailed the Park Service their "Final, Final, Final, Proposal" in the total amount of $13,993,215.96 that included a specific line item, in the amount of $3,185,864 representing the bid amount for the alternative top soil approach?

9. Whether on Friday, December 5, 2003, the Park Service accepted the "final, final, final, proposal" when the Park Service issued Task Order No. 35, for the lump sum amount of $13,993,216 ?

10. Whether it was a mistake for Task Order No. 35 and the accompanying Attachment 1, to indicate they included the work in the "construction drawings and specifications prepared by Olin Partnership (DWG. #087/41032)" because that drawing did not exist?

11. Whether as of December 5, 2003, the latest set of drawings and specifications which had been issued by Olin Partnership were dated November 25, 2003 and indicated they were "NOT FOR CONSTRUCTION"?

12. Whether the November 25, 2003 specifications which contained the same Section 02920 which set forth the requirements for "Soil Preparation," including the requirements for various topsoil mixes to be utilized in different locations around the project site becasue at that

time they were issued the Olin Partnership was unaware of the discussions between Grunley-Walsh and the Park Service concerning the alternative top soil approach?

13. Whether the Park Service directed Grunley-Walsh to provide topsoil with a sand mix of 60% to 65% and to use a "soil amendment" known as "leaf grow" which was contrary to the agreed upon alternative top soil approach?

14. Whether in order to comply with the Park Service's changed requirements, Grunley-Walsh had over 2,616 tons of sand delivered to the Project site during the period between May 19, 2005 and June 24, 2005, purchased 3,500 yards of "leaf grow," and mixed the sand, the top soil and the leaf grow for spreading and placement prior to sodding.

15. Whether reformation of the parties contract is required to correct the mutual mistake regarding the topsoil work to be performed and/or to reflect the true intent of the parties at the time Task Order was negotiated and entered into?

16. Whether Grunley-Walsh is entitled to an equitable adjustment in the amount of $259,863 for the costs claimed in this case?

**13. CASE NO. 06-391**
**(<u>MOD 10 UNILATERAL DEDUCTIONS CLAIM - $210,000</u>)**

1. Whether the Park Service did not require and/or issue any Task Order or directive to prepare a design for the sidewalk that would depict placement of joints, the type/placement of reinforcement steel, the use of any expansion material, the use of any caulking material and/or the interface of the new concrete work at existing foundations for telephone poles, light poles, traffic light poles, etc., which existed in the area of sidewalk to be replaced?

2. Whether the Park Service only required Grunley-Walsh to provide several sample "mock-ups" which the Park Service reviewed and approved – particularly with respect to concrete color and aggregate?

3. Whether the Park Service's on-site representatives observed the work relating to the sidewalks and raised no comment, objection or concern about the construction methods.

4. Whether approximately 4 months after the July 4, 2005 re-opening celebration for the Monument cracks began to develop in the sidewalks?

5. Whether when the cracks began to develop, no one could explain why they were developing?

6. Whether without knowing what caused the sidewalk cracking, the Park Service wanted Grunley-Walsh to tear out the cracked sidewalks and replace them using the same construction methodology – regardless of whether they cracked again?

7. Whether the Park Service can establish the construction of the 15th Street sidewalks was defective and/or the cracks were the result of faulty construction?

8. Whether by August 18, 2006, cracks that were identified prior to that date were repaired and replaced by Grunley-Walsh?

9. Whether the alleged 26 cracks claimed by the Park Service were observed prior to August 2006?

10. Whether maintenance of the Monument and its surrounding sidewalks was a Grunley-Walsh contract responsibility?

11. Whether the Park Service winterized the irrigation system – rendering it inoperable?

12. Whether there were items on the Park Service's irrigation system punch list that were not part of any specification or contract requirement?

13. Whether items on the irrigation punch list were the result of damage to the irrigation system after major events on the Monument mall?

14. Whether irrigation valve boxes were damaged by fire trucks and park service vehicles driving across the grass?

15. Whether the irrigation system has been in operational use by the Park Service for nearly 2 years?

16. Whether the Park Service is improperly attempting to use Grunley-Walsh as its "maintenance contractor" as well as its installation contractor?

17. Whether Grunley-Walsh is entitled to an equitable adjustment, and/or recission of the Park Service's unilateral modification no. 10, in the amount of $210,000 for the costs claimed in this case?

**Defendant identifies the following additional relevant factual and legal issues:**

1. What information Grunley-Walsh and its subcontractors were required to consider in preparing the project design pursuant to Task Order 28?

2. The responsibility for costs during construction resulting from omissions and errors in the project design in Grunley-Walsh's design-build contract.

3. The extent of Grunley-Walsh's responsibility for locating, identifying, and accommodating for subsurface conditions and utilities in the design and construction of the project.

4. The extent of Grunley-Walsh's responsibility for maintaining and protecting the project site, whether Grunley-Walsh failed to do so, and if so, the extent to which the damages claimed by Grunley-Walsh were caused by such a failure.

5. Whether the work at issue in Grunley-Walsh's complaints was performed at the direction of Government officials with authority to make changes to the contract?

6. Whether a Government official with authority to make changes to the contract changed the contract topsoil requirements for the project, and if so, when such a change occurred?

7. Whether Grunley-Walsh provided the Government with timely notice that it considered the work at issue to constitute changes to its contract?

8. Whether construction drawings were a contract deliverable, and whether Grunley-Walsh is entitled to be compensated for construction drawings under the contract?

9. Identification of the specific unpaid subcontractor invoices that Grunley-Walsh seeks payment for by the Government, identification of the specific work that the unpaid subcontractor invoices relate to, determination of whether the work was performed at the direction of a Government official with authority to make changes to the contract, whether the work constitutes changes to the contract that Grunley-Walsh is entitled to be compensated for, and if so, in what amount.

**i. What is the likelihood of settlement? Is alternative dispute resolution contemplated?**

The parties currently do not anticipate that the case will settle, however, the parties intend to discuss settlement as discovery progresses. Plaintiff will engage in alternative dispute resolution should Defendants agree to engage in same. Defendant does not believe that alternative dispute resolution is appropriate at this time, but will continue to evaluate the issue as discovery progresses.

**j. Do the parties anticipate proceeding to trial? Does either party, or do the parties jointly, request expedited trial scheduling?**

If this case cannot be resolved through settlement or dispositive motions, the parties anticipate that they will proceed to trial. Neither party requests expedited trial scheduling. At this time, the parties anticipate that any trial would take place in Washington, D.C. Defendant requests that part of any trial take place in Lakewood, Colorado to accommodate witnesses residing there who are former Government employees.

**k. Are there special issues regarding electronic case management needs?**

The parties have no special issues regarding electronic case management needs.

**l. Is there other information of which the Court should be aware at this time?**

The parties have no additional information of which the Court should be aware at this time.

**m. Discovery Plan**

| | |
|---|---|
| Initial Disclosures: | July 27, 2007 |
| Disclosure of Expert Reports: | April 21, 2008 |
| Conclusion of Discovery: | July 7, 2008 |

Respectfully submitted,

/s/ Roger C. Jones

ROGER C. JONES
Huddles Jones Sorteberg & Dachille, P.C.
10211 Wincopin Circle, Suite 200
Columbia, Maryland 21044
301-621-4120

Counsel for Plaintiff, Grunley-Walsh, LLC

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Tara Kilfoyle
TARA KILFOYLE
Trial Attorney
Commercial Litigation Branch
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-1709
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

Alton Woods, Assistant Solicitor
Emily Parkhurst, Attorney Advisor
Department of the Interior
General Law Division
1849 C Street NW
Room 7322
Washington, DC 20240

July 13, 2007